IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONALD RAY BROWN,

     Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,[1]

     Defendant.

CIVIL ACTION FILE NO.

1:17-cv-1504-ODE-JKL

## FINAL REPORT AND RECOMMENDATION

Plaintiff Donald Ray Brown seeks judicial review of the final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying his application for supplemental security income ("SSI").[2]  Plaintiff raises one issue

---

[1] Nancy A. Berryhill was the Acting Commissioner of Social Security beginning January 23, 2017.  However, her acting status ended as a matter of law pursuant to the Federal Vacancies Reform Act, 5 U.S.C. § 3345, *et seq*.  Pursuant to Fed. R. Civ. P. 17(d), a public officer who sues or is sued in an official capacity may be designated by official title rather than by name.  Since Ms. Berryhill is no longer the Acting Commissioner, the Clerk is **DIRECTED** to identify Defendant by the official title rather than by name.

[2] Plaintiff also applied for disability insurance benefits ("DIB") contemporaneously with his application for SSI.  (Tr. 186-90.)  The administrative law judge denied the application for DIB because Plaintiff had engaged in substantial gainful activity during the relevant period.  (Tr. 18-22.)  Plaintiff does

on appeal:  whether the administrative law judge ("ALJ") erred in finding that Plaintiff's mental impairments of affective disorder and alcohol/substance abuse disorder were not severe impairments.  Specifically, Plaintiff contends that the ALJ improperly relied on the opinions of reviewing state agency psychological consultants, James Piat, M.D., and David E. Massey, Ph.D., who opined that Plaintiff had no severe mental impairments, and discounted the opinion of his treating psychiatrist Dierdre Cosby, M.D.  After careful consideration of the record and the briefs of the parties, it is **RECOMMENDED** that the Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings consistent with this decision.

## I.    PROCEDURAL HISTORY

On April 23, 2014, Plaintiff applied for SSI, alleging disability beginning on January 1, 2012.  (Tr. 191-96.)  The application was denied initially and on reconsideration.  (Tr. 116-19, 123-26.)  Plaintiff requested and was granted an administrative hearing before an ALJ (Tr. 40-82, 138-40), and on December 23,

---

not challenge the denial of DIB on appeal; thus, the Court addresses only the denial of his application for SSI.

2016, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled.  (Tr. 12-39.)

Applying the sequential process required by 20 C.F.R. § 416.920,[3] the ALJ first found that there had been a continuous twelve-month period during which Plaintiff did not engage in substantial gainful activity.  (Tr. 22.)  The ALJ next found at step two of the sequential analysis that Plaintiff had a single severe impairment of spinal disorder.  (*Id.*)  Pertinent to this appeal, in making his step two determination, the ALJ found that Plaintiff's medically determinably mental impairments of affective disorder and alcohol/substance abuse, considered singly

---

[3] By regulation, the Commissioner evaluates claims for disability insurance benefits using the following five-step evaluation:  "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011); *see also* 20 C.F.R. § 416.920(a).  The claimant has the burden of proof on the first four steps.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). At the fifth step, the burden shifts to the Commissioner to demonstrate that there are jobs within the economy that the claimant can perform.  *Id.*  If the Commissioner makes that showing, then the burden shifts back to the claimant to prove that he is unable to perform those jobs.  *Id.*

and in combination, did not cause more than minimal limitation in his ability to perform basic mental work activities and were therefore non-severe.  (Tr. 23-26.) The ALJ then found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 27.)

After identifying Plaintiff's impairment, the ALJ evaluated Plaintiff's RFC and found that he had the RFC to perform medium work as defined in the regulations, but could never climb ladders, ropes or scaffolds; could only frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and must avoid concentrated exposure to hazards.  (Tr. 27-32.)  At step four of the sequential analysis, the ALJ determined that Plaintiff was capable of performing past relevant work as a kitchen helper, as such work did not require the performance of work-related activities precluded by his RFC.  (Tr. 32-33.)  Accordingly, the ALJ concluded that Plaintiff was not disabled.  (Tr. 33.)

Plaintiff requested a review of the hearing decision, but on March 2, 2017, the Appeals Council denied the request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7.)  Plaintiff then filed the instant action seeking review of the Commissioner's denial of benefits.  [Doc. 1.]

## II.   STANDARD OF REVIEW

This Court must review the Commissioner's decision to ensure that it is supported by substantial evidence and is based upon the proper legal standards. *Winschel*, 631 F.3d at 1178.  Substantial evidence is "more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  Specifically, substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel*, 631 F.3d at 1178 (quotation omitted).  The Court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," even if the evidence preponderates against the Commissioner's decision. *Bloodsworth*, 703 F.2d at 1239.  In contrast, however, the review of an ALJ's application of legal principles is plenary. *Walker v. Bowen,* 826 F.2d 996, 999 (11th Cir. 1987).

## III.   DISCUSSION

In his appeal to this Court, Plaintiff argues that the ALJ erred in finding Plaintiff's mental impairments of affective disorder and alcohol/substance abuse disorder were not severe impairments.  At step two of the sequential analysis the ALJ must determine whether the claimant has a "severe impairment"—*i.e.*, an impairment that significantly limits one's ability to perform "basic work activities"

for at least 12 consecutive months.  *See* 20 C.F.R. §§ 416.909; 416.920(a)(4)(ii); 416.920(c); 416.921; *see also* Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 at *1.   The claimant bears the burden of demonstrating that such impairment significantly affects his ability to perform basic work activities.  *See McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986).

The regulations in effect at the time of the ALJ's decision required that when a claimant is found to have a mental impairment, the ALJ must determine its severity by evaluating its effect on the following four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation.  20 C.F.R. § 416.920a(c)(3); *see also* 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00C.   These four functional areas are commonly referred to as the "paragraph B criteria."  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C.  Activities of daily living include cleaning, shopping, cooking, and caring appropriately for personal grooming and hygiene; social functioning refers to the capacity to interact effectively and on a sustained basis with others; concentration persistence, or pace refers to the ability to focus attention sufficiently long to allow for the completion of tasks commonly found in work settings; and episodes of decompensation are temporary exacerbations in symptoms

6

accompanied by a loss of adaptive functioning, which makes it difficult to perform activities of daily living, maintain social relationships, and sustain concentration, persistence, or pace. *Id.* The ALJ must evaluate the first three functional areas on a five-degree scale: none, mild, moderate, marked, or extreme. *See* 20 C.F.R. § 416.920a(c)(4). The ALJ rates the fourth functional area on a four-point scale, ranging from "none" to "four or more episodes." *Id.* If the first three functional areas are rated as "none" or "mild" and the fourth area is rated as "none," the impairment will generally be found not to be severe. *Id.* § 416.920a(d)(1). If, however, the mental impairment is severe but does not meet or medically equal a listed impairment, the ALJ must conduct an RFC assessment. *Id.* § 416.920a(d)(3).

Here, the ALJ discussed each of the "paragraph B" criteria, and found that Plaintiff had no more than mild limitation in any of the first three functional areas, and no episodes of decompensation of extended duration. (Tr. 23-24.) The ALJ wrote as follows:

> The first functional area is activities of daily living. In this area, the claimant has mild limitation. Specifically, on his Function Report, the claimant reported that he has only physical problems completing his personal care, does not need reminders for taking care of personal needs but needs reminders to take medications, prepares simple meals daily, cannot do household chores due to pain, uses public transportation and goes outside every day, and

goes shopping in stores for food and household goods ([Tr. 1078-80]). Although the claimant indicated that he could not pay bills, count change, handle a savings account, or use a checkbook/money orders, he attributed such inabilities to not having money ([Tr. 1080-81]). At most, the above facts tend to show that the claimant has mild limitation in activities of daily living.

The next functional area is social functioning. In this area, the claimant has mild limitation. The claimant reported shopping in stores once per month, using public transportation or catching rides with friends to get around, spending time with others via Alcoholics Anonymous group meetings, having no problems getting along with family, friends, and neighbors, getting along "good" with authority figures, and having never been fired from a job due to difficulties getting along with others ([Tr. 1080-83]). These facts support finding no more than mild limitation in social functioning.

The third functional area is concentration, persistence, or pace. In this area, the claimant has mild limitation. As noted above, although the claimant indicated that he could not pay bills, count change, handle a savings account, or use a checkbook/money orders, he attributed such inabilities to not having money ([Tr. 1080-81]). He also reported that he could handle changes in routine "fair", could pay attention a "fair" amount of time, finishes what he starts, follows instructions "fair", reads as much as twice per day, and uses public transportation to get around ([Tr. 1080-83]). Overall, these facts suggest that the claimant has only mild limitation in his ability to maintain concentration, persistence, and pace.

The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation which have

> been of extended duration.  Specifically, the claimant's
> psychiatric treatment has consisted of group therapy,
> individual therapy, and multiple initial psychiatric
> evaluations with different providers and medication
> management visits.

(Tr. 23-24.)

In support of his "paragraph B" findings, the ALJ then gave a detailed

discussion of the opinion and medical evidence of record.  (Tr. 24-26.)  He wrote:

> The above "paragraph B" findings are consistent with the
> State agency psychological consultants' assessments,
> which found no severe mental impairments (*see* [Tr. 83-
> 92, 95-111]).    The undersigned has given these
> assessments great weight as they are consistent with the
> claimant's reported functioning and his limited and
> inconsistent psychiatric treatment.   Specifically, the
> claimant's psychiatric treatment did not begin until early
> July 2014, when he presented for an initial
> biopsychosocial pre-screening assessment at Grady
> Memorial Hospital for depression, and it was noted that
> he received Zoloft from his primary care provider ([Tr.
> 828-47]).  One week later, the claimant walked into the
> psychiatric clinic and requested a diagnostic letter for
> housing, to which he was instructed to return later in the
> week ([Tr. 860]).
>
> On July 11, 2014, the claimant presented to Keith Wood,
> Ph.D. for a psychiatric diagnostic assessment, and on
> examination, the claimant was appropriately dressed,
> was open, was cooperative, was alert and oriented, had
> clear speech, had an angry affect and depressed mood,
> had tight associations, had logical and clear thinking, did
> not trust people, reported no hallucinations, was
> hypervigilant, and had impaired attention but his memory

was within normal limits ([Tr. 866-88]).   Dr. Wood assessed the claimant with major depressive disorder, *single episode, mild* and alcohol/cocaine dependence in remission for seven years (*Id.*).   Two months later, the claimant presented to DeKalb Community Service Board for a psychiatric evaluation due to depression with suicidal ideation but no clear intent ([Tr. 895-916]). Despite his denial of any hallucinations just two months prior, he alleged that he had experienced hallucinations for the past six to twelve months (*Id.*).   Although the claimant was referred to a crisis center, it should be noted that he reported being active in the Covenant Community and All Saints Alcoholics Anonymous group (*Id.*).

Just two weeks later, the claimant presented to Stephanie Winn, M.D., to get a psychiatric diagnosis to help him get mental health housing ([Tr. 955-57]).   Notably, the claimant again reported no hallucinations and Dr. Winn indicated that the claimant would likely benefit from medication for mood and sleep, but his compliance was questionable (*Id.*).   Two weeks later, the claimant presented to group therapy for what appears to be the only time throughout the record ([Tr. 1065]).   The claimant did not seek psychiatric services again until early November 2014, when he "mistakenly" thought he had a mental health appointment but while he was in the clinic requested to change providers because "[Dr. Winn] is only trying to medicate me" ([Tr. 1091]).   Despite this encounter, the claimant presented to Dr. Winn one month later, and although Dr. Winn noted that she and the claimant mutually decided that the claimant would benefit from medications, the claimant stated that "medication will not fix his problems and would like to know if my role is to 'hand out medicine'" ([Tr. 1092-95]).

10

It is later revealed that the claimant was upset with Dr. Winn because of what she put on the form he requested be completed, and the claimant admitted that his medical and *physical* problems were what kept him from working ([Tr. 1092-95]).    The claimant again denied hallucinations, reported that he "might" keep taking his medications, and declined to make a follow-up appointment with Dr. Winn (*Id.*).  The record shows that the claimant began individual counseling in January 2015, which continued approximately once per month through June 2015 (*see* [Tr. 1164-68, 1177-79, 1182-83, 1281-82, 1307, 1320-21]).    In February 2015, the claimant established care with Dierdre Cosby, M.D., to whom he reported frequent hallucinations of "noises" and paranoia ([Tr. 1169-71]).  Despite these significant complaints, the claimant declined any antipsychotics, and Dr. Cosby increased the claimant's Zoloft[1] (*Id.*). One month later, the claimant presented to Dr. Cosby for a routine medication management meeting, and it was noted that the claimant could benefit from additional medications but he declined due to possible side effects ([Tr. 1179-82]; [Tr. 1096]).

> [1] The [ALJ] notes that the claimant's complaints with Dr. Winn were related to her prescribed medication, but the claimant made no such complaints regarding Dr. Cosby increasing the same medication that Dr. Winn had prescribed.

On the same day as his medication management visit in March 2015, Dr. Cosby completed a certification form for the Department of Family and Children Services indicating that the claimant was not able to work in any capacity and would not be able to do so for at least 52 weeks ([Tr. 1097]).  The undersigned has afforded this opinion no special significance as it is not specific regarding the claimant's workplace limitations, is not

11

consistent with the claimant's conservative treatment, was rendered after only a single visit, and opines on a matter reserved to the Commissioner (20 CFR 416.927(d)).  Interestingly, the claimant did not present to Dr. Cosby again for medication management until June 2015 ([Tr. 1308-10]).   Although the claimant presented almost monthly to Dr. Cosby for medication management visits from June 2015 through April 2016 (*see* [Tr. 1330-32, 1335-37, 1344-47, 1352-58]; [Tr. 1377-82, 1399-1402, 1413-16]), the record shows that the claimant was noncompliant with his medications at times, reported no side effects, had minimal to no changes in his medications, and his primary care provider noted in February 2016 that his depression was controlled ([Tr. 1383-87]).

As for the other opinion evidence regarding the claimant's mental impairments and limitations, Dr. Cosby opined in May 2016 that the claimant was disabled from major depressive disorder with psychosis and post-traumatic stress disorder and that drug addiction and alcoholism were not material ([Tr. 1425]).   The undersigned affords this opinion no special significance as it opines on a matter reserved to the Commissioner (20 CFR 416.927(d)), his diagnosis of a major depressive disorder with a psychotic component is questionable in light of the claimant's prior reports to other medical providers of no hallucinations and the claimant's refusal to not take antipsychotic medications, and the opinion is inconsistent with Dr. Cosby's treatment notes, which show a relatively stable condition.

Dr. Cosby also opined in May 2016 that the claimant has moderate limitation in activities of daily living, marked restriction in social functioning, and marked restriction in concentration, persistence, and pace and that the claimant has experienced one episode of decompensation

12

of an extended duration ([Tr. 1426-1432]).  The opinion goes on to indicate that the claimant has no useful functioning in complex job instructions and relating predictably in social situations (*Id*.).  The undersigned gives Dr. Cosby's opinion very little weight as it is inconsistent with itself, it is inconsistent with the claimant's own reports of functioning, it is not well supported, and it is inconsistent with the claimant's relatively conservative treatment detailed above.  For example, despite Dr. Cosby noting that the claimant has fair to good functioning in almost every area of mental work activities, he nonetheless opines that the claimant has moderate limitation in activities of daily living, marked restriction in social functioning, and marked restriction in concentration, persistence, and pace. Furthermore, Dr. Cosby indicated that the claimant suffers from repeated episodes of decompensation of an extended duration, yet he circled only one episode of decompensation of an extended duration in the psychiatric review technique form.

(Tr. 24-26 (emphasis in original).)

Plaintiff argues that the ALJ erred by giving great weight to the opinions of the non-examining state agency psychological consultants, Drs. Piat and Massey, who opined that Plaintiff had no severe mental impairments.  [Doc. 16 at 16-18.] In so arguing, Plaintiff contends the ALJ rejected Dr. Cosby's treating source statements and examination findings based upon a misreading of her opinions, and that Dr. Cosby's opinions conflicted with the state agency opinions.  [*Id*.]  By relying on the state agency physicians' opinions alone and/or in contradiction to

Plaintiff's treating physician, then, the ALJ failed to provide substantial evidence for her step two determination that Plaintiff's mental impairments of affective disorder and alcohol/substance abuse disorder were not severe impairments.  [*Id.*] I agree.

As a general matter, the opinions of non-examining, consulting physicians, when contrary to those of examining physicians, are entitled to little weight, and, taken alone, do not constitute substantial evidence to support an administrative decision.  *Swindle v. Sullivan*, 914 F.2d 222, 226 n.3 (11th Cir. 1990); *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985).  Even so, an ALJ may rely on the opinions of non-examining physicians when their opinions do not contradict the findings of examining physicians.  *Edwards v. Sullivan*, 937 F.2d 580, 584-85 (11th Cir. 1991).  Thus, if an ALJ properly discounts an examining and/or treating physician's opinion, then an ALJ may rely on contrary opinions of non-examining physicians.  Based on the record before me, however, I cannot conclude that the ALJ articulated good cause to give very little weight to Dr. Cosby's opinion concerning Plaintiff's mental limitations.

For disability benefits claims filed before March 27, 2017, the ALJ must evaluate medical opinion evidence in accordance with the factors in 20 C.F.R.

§ 416.927(c).  *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1376-77 (N.D. Ga. 2006).   Those factors include whether the physician examined the patient, the evidence presented in support of the opinion, the physician's specialty, and the consistency of the opinion with the record as a whole.  20 C.F.R. § 416.927(c).  A treating physician's opinion generally is entitled to more weight, and when it is well-supported by clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ should give the opinion controlling weight.  *Id.*  Because of this deference, an ALJ must clearly articulate good reasons for discounting the opinion of a treating physician. *Winschel*, 631 F.3d at 1179; *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  Good cause for discounting a treating physician's opinion exists when the physician's opinion was not bolstered by the evidence, the record supports a contrary finding, or the physician's opinion was conclusory or inconsistent with the physician's own medical records.  *Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 823 (11th Cir. 2015); *Phillips*, 357 F.3d at 1240-41.  The Eleventh Circuit has held that "[t]he Secretary must specify what weight is given to a treating physician's opinion and any reasons for giving it no weight, and failure to do so is reversible error."  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

15

Applying these principles here, substantial evidence does not support the ALJ's decision to afford "very little weight" to Dr. Cosby's opinions regarding Plaintiff's limitations.[4]  On May 3, 2016, Dr. Cosby completed forms entitled "Medical Assessment of Ability to Do Work-Related Activities (Mental)" (the "Medical Assessment Form") and "12.04: Medical Evaluation (Affective Disorders)" (the "Medical Evaluation Form").  [Doc. 1426-32.]  In the Medical Assessment Form, Dr. Cosby indicated that Plaintiff had a "good" (which was defined as "satisfactory") ability to follow the rules, relate to co-workers, use judgment, and function independently.  (Tr. 1426-27.)  Dr. Cosby also indicated that Plaintiff had a "fair" (defined as "severely limited") ability to deal with the public, interact with supervisors, deal with work stress, and maintain attention and concentration.  (*Id.*)  Dr. Cosby explained the basis for her conclusions as follows: "[Plaintiff] does well 1:1 with individuals that he trusts.  However, his hypervigilance from the PTSD & paranoia that others want to harm him makes it difficult to achieve his trust.  Stress & changes in his routine exacerbate his symptoms."  (Tr. 1427.)

---

[4] The Commissioner does not dispute that Dr. Cosby was a treating physician, instead arguing only that good cause was provided for rejecting her opinions.  [*See* Doc. 17 at 18-19.]

16

Dr. Cosby also indicated that Plaintiff had no ability to perform complex job functions, a "fair" ability to perform detailed but not complex job instructions, and a "good" ability to perform simple job instructions.  (Tr. 1427.)  She explained that Plaintiff had no problems with intellectual ability or registration, but that his thought processes were tangential even on medication.  (Tr. 1428.)  She further noted that Plaintiff had difficulty with concentration and memory, which was consistently reported and intermittently noted on mental status exams.  (*Id.*)

Dr. Cosby additionally indicated that Plaintiff had a good ability to maintain his personal appearance, a fair ability to both behave in an emotionally stable manner and demonstrate reliability, but no ability to relate predictably in social situations.  (Tr. 1428.)  She explained that Plaintiff was consistently noted to be appropriately dressed and groomed, but that he would present with a depressed mood with angry affect, which had led to arguments and hostile behaviors in the past.  (*Id.*)  She further noted that Plaintiff's paranoia made his interactions difficult to predict, and mood symptoms influenced his reliability and ability to follow through on tasks.  (*Id.*)

On the Medical Evaluation Form, also dated May 3, 2015, Dr. Cosby indicated that Plaintiff suffered from depressive syndrome, characterized by sleep

17

disturbance, decreased energy, difficulty concentrating or thinking, thoughts of suicide or death, and hallucinations. (Tr. 1429-30.) She noted that he had moderate restrictions with respect to activities daily living, marked difficulties in maintaining social functioning, marked deficiencies with respect to concentration, persistence, or pace, and one repeated episode of decompensation of extended duration. (Tr. 1430-31.) In describing Plaintiff's functional limitations, Dr. Cosby wrote that fatigue, decreased concentration, and recent memory impairments affected Plaintiff's ability to complete tasks in a timely manner, and that paranoia and hypervigilance interfere with appropriate interactions with others and would make his behavior difficult to predict. (Tr. 1432.) In response to a request to identify the objective findings to support her opinion, she wrote that Plaintiff had an angry/constructed affect; impaired attention and recent memory on intermittent mental status examinations; intermittent abnormal thought processes; difficulty getting along with staff in the clinic due to hypervigilance and paranoia that someone was trying to harm him. (*Id.*)

The ALJ gave several reasons for discounting the foregoing opinions. First, he explained that Dr. Cosby's opinion was "inconsistent with itself." (Tr. 25.) By way of example, the ALJ explained that Dr. Cosby noted that Plaintiff had "good"

to "fair" functioning in almost every area of work activity; and yet found that Plaintiff had moderate limitations in activities of daily living and marked restrictions in social functioning and maintaining concentration, persistence, and pace. (Tr. 26.) I fail to see the internal inconsistency. The Medical Assessment form defined "fair" as "severely limited," and as discussed above, there were numerous areas of functioning in which Dr. Cosby noted that Plaintiff had only fair ability to function—that is, severely limited functioning. Indeed, the Commissioner appears to concede that the ALJ likely understood the term "fair" to mean "adequate," and that given the specialized definition set forth on the form, Dr. Cosby's opinion was, in fact, not internally inconsistent. [Doc. 17 at 23.]

The ALJ gave another example of the supposed internal inconsistency, namely that Dr. Cosby indicated that Plaintiff suffered from repeated episodes of decompensation of an extended duration, but circled only one such episode on the Medical Evaluation form. (Tr. 26.) The form gave Dr. Cosby the choice of selecting, none, one, two, three or "four+" repeated episodes of decompensation, each of extended duration, and Dr. Cosby indicated as follows:



4. **Repeated episodes of decompensation, each of extended duration**

None  One  Two  Three  Four+

(Tr. 1431.)  She also indicated as follows:

> 1.  Repeated episodes of decompensation, each of extended duration  x(one, 1)
>
>    Present or Absent

(*Id*.)  The Commissioner maintains that it is difficult to know whether Dr. Cosby meant to indicate that Plaintiff had one episode of decompensation of an extended period, or whether she had more than one (thus, a *repeated* episode).  [Doc. 17 at 24.]  I, however, see no inconsistency.  These responses reflect Dr. Cosby's opinion that Plaintiff had one instance of a repeated episode of decompensation of an extended period.[5]

The Commissioner maintains that even if the ALJ erred in concluding that Dr. Cosby's opinion was internally inconsistent, the error was harmless because the ALJ gave other reasons for discounting Dr. Cosby's opinion, namely, that Dr. Cosby's opinion was inconsistent with Plaintiff's own reports of functioning; it was not "well-supported"; and it was inconsistent with Plaintiff's "relatively conservative treatment."   [Doc. 17 at 22-23 (citing Tr. 25-26).]   I disagree.

---

[5] Even if the phrase "one, repeated episode" were difficult to understand, there is no doubt that Dr. Cosby's opinion was consistent on this point, having specially noted that there was only "x(one, 1)" such episode.  (Tr. 1431.)

20

Although the ALJ did a thorough job summarizing Plaintiff's mental health treatment history, I cannot discern **how** Dr. Cosby's report is inconsistent with Plaintiff's reports of function, **how** it is not "well-supported," or **how** it is inconsistent with Plaintiff's treatment.  In his function report, for example, Plaintiff reported that he had a "good" ability to get along with authority figures, and that he had a "fair" ability to pay attention, follow written and verbal instructions, and handle changes in routine.  (Tr. 1082-83.)  It is not clear, however, how those reports are inconsistent with Dr. Cosby's opinion, especially since the thrust of her opinion was that Plaintiff's behavior was unpredictable.  Likewise, the ALJ's assertion that Dr. Cosby's opinion was not "well-supported" is not enlightening, as it is not apparent what further support the ALJ expected.  Unlike in many social security cases where a treating source simply checks a box or circles an answer on a firm, Dr. Cosby provided a detailed narrative explaining the reasons for her opinion, which the ALJ did not address.  Finally, the ALJ's contention that Dr. Cosby's own treatment notes were inconsistent with her opinion is too conclusory

for this Court to conduct a meaningful review of the ALJ's rationale.[6]  Remand is therefore required for further consideration of Dr. Cosby's records and opinions.

As noted above, the law in this Circuit is that the opinions of non-examining, consulting physicians, when contrary to those of examining physicians, are entitled to little weight.  *Broughton*, 776 F.2d at 962.  Since the ALJ did not articulate good cause to discount Dr. Cosby's opinion, the ALJ's decision to give great weight to the non-examining state agency psychologists cannot be affirmed.  Accordingly, I recommend that the decision of the Commissioner be **REVERSED** and this case **REMANDED** for further proceedings.

_____

[6] The Commissioner appears to contend that Dr. Cosby's opinion was inconsistent with Plaintiff's prior reports of no hallucinations, his refusal to take anti-psychotic medications, and records indicating "a relatively stable condition." [Doc. 17 at 20-21.]  That is not, however, what the ALJ wrote, and based on the record before me, I cannot tell for sure that that was what the ALJ was referring to. In any event, the refusal to take anti-psychotic medications might undermine Plaintiff's subjective complaints, but it does not necessarily undermine Dr. Cosby's opinion as to what Plaintiff's limitations were.  Likewise, the inconsistency in reporting hallucinations might be a basis for discounting Plaintiff's credibility, but I am not persuaded that that inconsistency alone justifies wholesale rejection of Dr. Cosby's opinion.  Finally, it is unclear what the Commissioner means by a "relatively stable condition."  If the Commissioner means that Plaintiff's condition did not improve, then that would not necessarily undermine Dr. Cosby's opinion.

## IV.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings consistent with this decision.

IT IS SO RECOMMENDED this 23rd day of March, 2018.

_____

JOHN K. LARKINS III
United States Magistrate Judge

23